All right, the next case on the calendar is United States v. Grant. And so, Mr. Hunter, you've reserved two minutes for rebuttal. That gives you eight to begin. The floor is yours. Yes, thank you, Your Honor. This is the Butterfly case. Butterfly v. HBC Investments. Oh, I'm sorry. I misread it. You know what? I switched because I have two pieces of paper. This is the Butterfly case, of course. Apologies. Thank you, Your Honor. Butterfly v. HBC Investments, et al. And may it please the Court, James Hunter for appellant. Section 16B's limits are narrowly drawn, and Bedbath knows it. In the 20 years since Bell Atlantic v. Twombly, we count a total of 15 Section 16B cases appealed to this Court from threshold dismissals under Rule 12b-6. Of those 15 cases, all but one were affirmed. But Bedbath took this appeal because what we're asking for lies well within the narrowly drawn limits of the statute. We're asking for a straightforward application of levy of the plain terms of Rule 13d-3b and of the SEC guidance levy relied on. The common theme of these three texts is that blockers are not per se enforceable. A blocker will be respected as a Section 16B structuring device if it's binding and effective, and a complaint adequately pleads a Section 16B claim if it plausibly alleges that a blocker did not bindingly and effectively limit the investor's rights to less than 10% of the stock. Okay, before we even get to the blockers, could you lay out for me and try to explain it as if to someone who knows nothing about corporate finance and didn't take calculus, could you explain to me exactly what your theory is of when and how Section 16 was violated? Even putting aside, assume the blockers simply don't work. Just make clear to me when the Hudson's share got to be over 10% and what are the transactions that are the short swing transactions?  As alleged, Hudson Bay was over 10% from February 7th to April 18th, 2023. During that period, it made hundreds of thousands of sales, open market sales, garden variety, cash for stock transactions, those are sales under the statute. It also made scores of conversions and exercises. Did you in your complaint claim that there was an overage? I didn't see that in your complaint. I saw you claiming that the blocker was inadequate, but I didn't see in your complaint a statement that that momentary 2% greater when stocks had already been sold violated. Did you make that in your complaint? I beg your pardon, Your Honor. I didn't quite hear the question. Can you repeat it? Yes. Did you put in your complaint that there was a specific violation during that time, that minimal time when they had more than 10%, 10.2%, but had already sold? I didn't see in your complaint an argument that that was a violation of the statute directly. Understood, Your Honor. Now, let me clarify. The allegation is not that the violation occurred just during that period when Hudson Bay was over 10%, was over 10%. The allegation is that Hudson Bay's overage demonstrates that the blocker did not bindingly and effectively constrain Hudson Bay's rights. And that's just one of our allegations. I can point to the other ones. But the point is, because the blocker did not bindingly and effectively constrain Hudson Bay's rights, under levy, the blocker must be disregarded and the transaction should be analyzed. Right, but the blocker has to be blocking something. I think that's what we're trying to get at. If Hudson Bay never had over 10%, then it was not subject to Section 16 at all, blockers or no blockers. And I'm just trying to understand what the theory is. For example, is your theory that because these convertible securities could be converted to common stock within, what is it, six months of the issuance, that from the get-go they were automatically over 10%? Is that the argument? That's exactly right. These derivative securities were immediately convertible and exercisable to acquire all of the underlying shares, subject only to the blocker. So if the blockers did not work or plausibly were ineffective, then Hudson Bay could have acquired all of the stock underlying the derivative securities on day one, and as of day one. Okay, I have that, but do we have any law on when a blocker is illusory? I mean, we have talk about it in levy and we have briefs from the SEC and other things, but what is it that makes a blocker illusory? If it's waivable, but it wasn't waivable here. So what are you arguing that makes it illusory in this case? We think first and foremost, the side letter. This is a secret side agreement drafted by Hudson Bay and signed up at the 11th hour before deal launch. It quietly defanged Hudson Bay's blockers and only Hudson Bay's blockers of any adequate means of enforcement. Well, it expressly incorporates the agreement, doesn't it? This is not exactly true, your honor. The side letter obligates the company to honor the transaction documents, but it doesn't obligate Hudson Bay to honor them. But the blocker says that it's, I mean, that it's null and void. Any transaction would be null and void if it hits 10%. And the side agreement basically says, yeah, we're living by that language. And our allegation is that those words were illusory because in practice, Hudson Bay actually had 10.1% of the stock in its brokerage account at 9.27 a.m. Well, they'd already sold some of them, right? I mean, you're suggesting that because the clearing hadn't happened, that they actually could dispose of the shares that they had sold? We don't think that's correct, your honor, with respect to this allegation. This allegation that Hudson Bay had 10.1% of the stock in its brokerage account, it doesn't depend on math, which I understand why Frank confessed. Okay. It is very difficult for your client to have enforced the blocker, but self-enforcement has been considered adequate. So the argument must somehow be that a defendant's behavior in limiting what you could do is a sign that they did not mean to or did not intend to enforce the blocker. Is that the argument you are making? And what do you give to support it? The argument is this. To be clear, we've never argued that a means of self-enforcement is necessary or that Bath's inability to enforce the blocker by itself makes the blocker ineffective. The side letter went well beyond that. It actively stripped Bed Bath of any means of enforcing the blocker. Bed Bath couldn't halt a suspicious acquisition, couldn't ask for an opinion or indeed any information about an acquisition, couldn't impose any procedures beyond the submission of a bear request form. Whatever number Hudson Bay wrote on that form, that's the number of shares Bed Bath had to  So this one— Well, every time Hudson Bay exercised a warrant or converted a stock, it certified that it was not amassing more than 9.99% of the common stock, right? That's right. But that's really just a repetition of the blocker's terms. And we submit that— Right. But you seem to be saying that you're speculating that they could and would breach the agreement that they'd already signed and that they, you know, were averting that they were complying with. Well, respectfully, Your Honor, it's not speculation. We allege the point in time when they actually had 10.1% of the stock in their brokerage account. And we asked in our opening brief, if the blocker was effective in limiting Hudson Bay to 9.99% of the stock, then how did it wind up acquiring 10.1% of it? And if it really had no power to dispose of that stock, then how did it manage to dispose of it? These questions have never been answered. And we believe that allegation by itself gives us significant traction in this case because our job as plaintiff was to nudge the ineffectiveness of the blockers across the line from possibility to plausibility. In our view, we shoved it all the way to actuality. We showed that the blockers were ineffective. There was 10.1% of the stock sitting in Hudson Bay's brokerage account at 9.27 a.m. on February 10th. But that included shares they'd already agreed to sell, right? We don't know. That may be. I think that's something that we would want discovery on to figure out exactly what their rationale for having that 10.1% in the account at that moment in time was. And I would add that at this point, we're relying on the fragmentary records that we've received through partial discovery. We don't know if we may find other instances in which the blockers were breached. Yeah. I'm still having a little trouble understanding how the blockers relate to your belief that the Hudson Bay was already, as a matter of law, over 10% as soon as this deal was entered, right? I mean, isn't that what you just told me a few minutes ago? Well, what the SEC has said, and Levy relied on the SEC guidance, is that if the blockers are not effective, then they should be disregarded and the case should be analyzed as if the blockers didn't exist. So if the blockers are effective, as we plausibly alleged, then you just look at the number of shares underlying the derivative securities. And on day one, that number amounted to eight. Oh, I see what you're saying. OK. So, and getting back to the 10.1% then, isn't that really critical? Because that's the evidence that you have that you would argue definitively shows that the blockers were ineffective, right? It's not a question of theoretically analyzing who could enforce it, or how easy it was to waive it, or anything like that. It's ineffective because it was ineffective. That's exactly right. It's not our only allegation, but it's proof positive. As I said- But is it? So the question is, was it ineffective if momentarily, when SOC had already been sold, or so it is said, it went slightly over, but with the stock sold, it was less than 10%. You're saying that's enough to show ineffectiveness. On the facts of this case, Your Honor, that's correct. And it's just, it's more than just this one incident, although in our view, if the blocker were effective, this one incident would not have happened at all. But the blocker by definition would say that, I guess, the last transaction that put them over 10% was null and void, right? The blocker would say that, but that didn't happen. It was not, in fact, null and void. They got the stock. Well, wait. How do we know it was not null and void? The issue really is, it seems to me, tell me if I'm wrong about this, that the blockers prevent the stock from being voted, and also prevent it from being disposed of. And I take it the position of the other side is that there was never any occasion to vote it. It never got voted. No one ever tried to vote it. If anyone had tried to vote it, you could have said it's null and void. And as far as disposing of it, they're saying it was already disposed of, so they had nothing to dispose. They had no power to dispose of this because they had already disposed of it and were just waiting for it to clear. Well, respectfully, Your Honor, we view that as a denial of the complaint's well-pleaded allegation. Yeah, so that's a fact issue, you're saying. The stock was sitting in the brokerage account. They can say, well, that stock has already been disposed. But in our view, if the stock's in the brokerage account, the stock's in the brokerage account. It's simply a well-pleaded fact that names the time, date, and the number of shares and the percentage. We believe that fact has to be assumed true. But again, that's not the only fact we raise. We think in the context of this deal, with an agreement like the side letter, we've established a plausible claim that the blockers weren't effective. And I'd like to return to the side letter because, in our view, it completely recast the structure of this deal. Investors bought into this deal thinking that a group of 29 people were putting in fresh equity when, in fact, one of these investors, Hudson Bay, had over 97 percent of the underlying equity and was not an investor at all. It was just planning to flip its stock as fast as it possibly could into the market. Had Hudson Bay had been required to disclose this plan under Section 13D by filing a required Schedule 13D, its plans and proposals for the disposition of Bed Bath stock would have been disclosed. But it relied on the side letter and its secretary. Now you're arguing 13B. But we have both the SEC memo and Judge Winter's concurring opinion in CVSX that very much limit what you can say under 13B. That is, it only applies where there was more than 10 percent, doesn't it, according to those opinions? We disagree, Your Honor. We think our claim is adequately pled under Judge Winter's opinion. Judge Winter's opinion said that beneficial ownership would be found when a transaction stops short of or conceals beneficial ownership while nevertheless providing that stock would vest at the signal of the would-be owner. And that's what we've alleged. We've alleged that the blockers, the publicly disclosed blockers, gave the impression that Hudson Bay had no right to acquire more than 9.99 percent. But the side letter made clear that all Hudson Bay had to do was put the number of shares it wanted on that request form, and Bedbath had to issue those shares. No questions asked. No additional procedures. No way to contest that acquisition. This significantly cut back. But they're null and void. Basically, you're making your 13th argument based on what you had originally made about the blocker not being there. I mean, it's based on the blocker not working and therefore the other. But of course, if you're right on that, we don't even need to get to that point because then the blocker wasn't working. Well, I think it's more than just the blockers not working, though, Your Honor. It's the scheme to evade as well. These blockers were used as part of an effort to avoid the kind of disclosure under Section 13D that would have advised investors that Hudson Bay was just planning to dump its stock on the market, triple the float, and do all of this within a matter of weeks in transactions that were sure to crush the stock price. But the difference between this case and Levy is Levy doesn't have a self-executing null and void provision. I mean, it would seem to me that this goes beyond what's in Levy in terms of a blocker to say that this, by the contract's terms, they can't acquire 10%. If they tried to vote on those, they would be barred from doing anything, right? Well, we've never argued that voting power is... Well, it's a bid to dispose of them, right? I mean, if it's by the terms of the agreement, any transaction that gets them over 10% is null and void. And so that transaction, they can't sell those securities. And we submit that these words, null and void, obinidio, held in advance, they were illusory words on the facts pleaded in this complaint. When 10.1% of the stock was sitting in Hudson Bay's account, how could Bed Bath possibly stop them from disposing of those shares? But I think you're ignoring the definition of beneficial ownership, which turns on whether there's the power to dispose or direct the disposition of a security. And at that point that you're saying they were at 10.1%, they'd already sold some of those shares. They hadn't cleared yet, but they'd sold, they'd disposed them. And your view is that they could sell them again? No, that's not our view. They could void those sales? Our view is this. Even after they've made a deal to sell those shares, that doesn't affect the right they have to acquire those shares from Bed Bath. And I think it's important to recognize that these are two independent transactions. This is not an ordinary brokerage case where an investor sells stock that's in his account and then the broker is committed to deliver that stock to close out the sale. In this case, Hudson Bay had a separate independent right to acquire that stock from Bed Bath. And as alleged in the complaint, Bed Bath had to put those shares wherever Hudson Bay directed. And not only that, but Hudson Bay had the right to revise and resubmit its requests even after it sold the stock and even after it submitted that original request form. And this is not a speculative allegation. Hudson Bay actually did this. In two cases, Hudson Bay revised and submitted its request forms to change the number of shares it wanted. Hudson Bay always had the power to revise and resubmit a request to change where it wanted the stock delivered. And then it could dispose of that stock somewhere entirely different. Thank you. All right. While you reserve some time for rebuttal, we'll now hear from Mr. Rappaport. Thank you, Your Honors. And may it please the Court, Douglas Rappaport of Aiken, together with my colleagues Kate Shapiro and Mike Chen, we represent the defendant, Hudson Bay. Your Honors, the District Court properly dismissed Plaintiff Section 16B claim because Hudson Bay was party to binding and enforceable contracts with Bed Bath that prevented Hudson Bay from acquiring greater than 10% beneficial ownership and becoming subject to Section 16B. Plaintiff therefore did not and could not plausibly allege that Hudson Bay was a Section 16B insider. In arguing otherwise, Plaintiff asked this Court to ignore the language of the blockers, ignore the language of the transaction documents and side letter, ignore the holding of Levy and its progeny, and ignore the law regarding beneficial ownership, schemes to evade, and contracts. Proper application of the law— That may be. They are asking us to ignore much of that language. And that's the strength of your case. But isn't what is going on here exactly the kind of insider trading that was meant to be prohibited? Respectfully, Your Honor, the answer to that question is no. These sort of serial exercises or conversions of securities and then having parties sell down and then buy back up is just precisely the type of conduct that occurred in Levy, in Logon, and in other cases and precedent that the Court has dealt with previously. So no, this is not the sort of trading that would result in a scheme to evade, Your Honor. Just to go back to the self-effect— Let's talk about what the scheme to evade is supposed to evade. Under subsection B of the regulation, 240.13d-3, we're talking about when this is part of a scheme to evade the reporting requirements of 13d. Now first of all, although this is not part of the liability claimed by the plaintiff here, you were in breach of 13d the whole time, right? Because you had more than 5% at all kinds of points during this. Our understanding, Your Honor, is our client strictly complied with all SEC disclosure requirements throughout this holding period. Was there ever a report that said Hudson Bay owns more than 5%? That's not in the record, Your Honor, but there's no allegations that Hudson Bay went out and evaded the reporting requirements. Hudson Bay scrupulously follows the reporting requirements. Moreover, Your Honor— But what is being evaded here principally, as Judge Calabresi was suggesting, is not so much perhaps the insider trading as such or the short swing thing as such, but is the reporting requirements, that if it went over 10%, there would be a reporting requirement. And everything is structured so as to keep it from being disclosed that Hudson Bay is almost acting as an underwriter here, dumping all of this stock into the marketplace, devaluing the stock that previous investors in Bed Bath & Beyond had. And if that were all known, their plans would not have worked, would they? Your Honor, if the full disclosure was out there, Hudson Bay scrupulously abided by its SEC disclosure requirements. And just to be really clear here, what Plaintiff is arguing here as far as scheme to evade is contradicted by binding precedent. That binding precedent includes the Supreme Court's decision in the Reliance Electric case cited in our brief. In that case, and I quote, liability cannot be imposed simply because the investor structured this transaction with the intent of avoiding liability under Section 16B. As significantly, Your Honor, this court, in a decision that I believe may have been written by yourself, in Elagas v. Perceptive, 902 F3rd 121, and the quote is, the Supreme Court has recognized and tolerated, and there's an ellipsis, insiders to work around Section 16B. The courts have recognized again and again that blockers are a perfectly legitimate way of structuring a transaction to avoid Section 16B. This court and others have rejected prior challenges to blockers as a scheme to evade. And that's included in the Levy case at pages 13 and 14. The Plaintiff here relies on Judge Winter's concurring opinion in CSX, but that concurring opinion does nothing but confirm that there was no scheme to evade here. In that opinion, Winter reasoned that conduct, quote, fully intended to avoid disclosure, end quote, does not violate Rule 13 D3B unless it includes, quote, substantial equivalence of the rights of ownership relevant to control, end quote, or comprises steps that, quote, stop short of or conceal the vesting of ownership while nevertheless ensuring that such ownership will vest at the signal of the would-be owner. Here the blockers did the opposite, Your Honor. They did the opposite of hiding Hudson Bay's control of any dispositive or voting power over Bed Bath. They prevented Hudson Bay from obtaining that power in the first place. And that's the crucial distinction with respect to scheme to evade. Plaintiff's attempt here to expand the concept of scheme to evade to reach the blockers is precisely the type of, quote, extraordinarily expansive interpretation, and that's Judge Winter's words, of Rule 13 D3B. Is there any case that would keep us, is there any case that would keep us from expanding Rule 13B beyond what Judge Winter suggested and beyond what the SEC suggested in CSX because we believe that this was, in fact, a scheme? Can you, now, you know, it's always dangerous for us to do something that is new, and I'm not saying we should do it given the rest, but is there any case that blocks us from doing it? Certainly, Your Honor. I believe the Reliance Electric case would. In Reliance Electric, the Supreme Court countenanced the structuring of transactions around Section 16B. In addition, Your Honor, if you take a look back at Levy, there was an argument, a scheme to evade argument made in Levy, and the court in that case said no, said this sort of trading up to the blocker position, then trading back down, then trading back up again is a viable way for investors to conduct their business and does not constitute a scheme to evade. I just want to touch on a few additional points, Your Honor. First of all, the blockers here are, as the bench has pointed out, quite self-effectuating. It doesn't merely say that any conversion that would take Hudson Bay above 9.99% threshold, quote, shall be null, and void, and treated as if never made. It also says Hudson Bay, quote, shall not have the power to vote or transfer, end quote, any shares in excess of 9.99%. It also says excess shares, quote, shall not be deemed to be beneficially owned by Hudson Bay for any purpose, including for purposes of Section 13D or Rule 16A1A1 of the 1934 Act. If I can briefly address the side letter here, Your Honor, plaintiff inaccurately claims that the blockers were ineffective because the side letter prevented Bed Bath from monitoring Hudson Bay's beneficial ownership and thus made it difficult for Bed Bath to comply with the blockers. The side letter did no such thing. Plaintiff's characterization of the side letter is contradicted by the plain terms of that document. That document was entered in to provide Hudson Bay with the right to participate in future offerings to prevent the dilution of its shares. Most importantly, Section 2N of the side letter merely confirms that the terms provided in the other transaction documents, quote, set forth the totality of the procedures required, end quote, to exercise the warrants and convert the preferred stock. Nothing more. And that's the joint appendix at 221. The side letter did not prevent Bed Bath from enforcing the blockers, but explicitly affirmed that the parties remain subject to the terms, conditions, and time periods of the existing transaction documents. And I'll note that in the integration clause in the side letter, it incorporates by reference those transaction documents so they are treated collectively. One does not contradict the other. With respect to this concept that this side letter was some secret agreement, the fact that the side letter was not publicly reported falls on Bed Bath, the entity plaintiff purports to have succeeded here. Bed Bath was not only allowed, but obligated to disclose the side letter if it determined it was a material term of the agreement. Bed Bath, along with his counselor Kirkland, decided not to disclose the agreement. If I can touch briefly, Your Honors, on the beneficial ownership concept here. You're talking about the 10.1%? 10.1% exactly, Your Honor. And the key flaw, as recognized by the District Court, is that the touchstone of determining whether someone's a 10% owner is the concept of beneficial ownership, whether you have investment discretion and voting discretion. It is not the concept of custody, whether the shares still sit in your account. Page 29 of the lower court's decision, the court noted that plaintiff admits that, quote, if the shares that defendant had already sold to third parties are deducted from plaintiff's calculations, Hudson Bay would remain under 10% beneficial ownership. Is that in the pleadings or is that outside of the pleadings? That is in the lower court's opinion, Your Honor. No, I get that, but I mean, this is a motion to dismiss, right? Yeah, I just want to see if we have a side on that. And that would be page 29 of the opinion. Well, that I'm fine with, but I mean, there's a sort of a bear allegation at paragraph 285 of this lengthy complaint that says 19.5 million shares represented more than 10.1% of BBB Wise shares. Your Honor, my learned colleague suggests that it was in the briefing below on the motion to dismiss. Again, though, I mean, this is a motion to dismiss, so we're really within the four corners of the complaint, unless I'm missing something.  Your Honor, setting aside whether there was a concession or not, the law is the law on beneficial ownership here. The Avalon Holdings case makes it very clear. Yes. No, no, no, no. I don't think you're getting the question. I think we would all agree with what you said as a legal principle about beneficial ownership and the fact that it was sitting in the account doesn't necessarily mean that Hudson had the right to sell those shares and was the true owner of them or the beneficial owner or anything else. On the other hand, the allegation in the complaint, and maybe the answer is that it's conclusory, I don't know, is that it had control of that 10.1%. The answer seems to be, but it was already committed to be sold, but that is a factual claim about what existed at the time, what the facts were. And that's not a fact that is drawn from the complaint. When you talk about a concession, are you saying that it was in their briefing that they admitted that that was so? Correct, Your Honor. I see. Well, there's an Exhibit K that lays out that it's a table calculating these things, and so this is a little hard to parse, but I mean, I think your argument is based on the pleadings, right? Your Honor, it is, and in fact, the pleadings allege custody, allege holding, not beneficial ownership. In addition, I'll add that in this particular case, that table that's in the complaint, Your Honor, plaintiffs had the trading records here, so plaintiff had those trading records in possession, and that formed the bulwark for their complaint at the end of the day. Well, I mean, I took your argument to be that it's all in there. Exhibit K lays this out in some detail, and the characterization or explanation of Exhibit K in the briefing adds some clarity to what it is that the plaintiffs are arguing here. Am I right about that? Yeah, I believe that that's correct, Your Honor. I believe that's correct. But again, the thing that the lower court focused in on and that the law focuses in on with respect to Section 16b is this concept of beneficial ownership. Is this concept that shares you have disposed of that are still in your account, that you may still have custody over, are not beneficially owned by you. Right, and where do we find the allegation in the complaint or acceded to by the complaint or something that, where do we find the fact that these shares had already been sold? In other words, no one's questioning that that may be the key fact. How do we know that is the fact on 12b-6? It's Exhibit K, Your Honor. Okay. Exhibit K. And, you know, and which line and which column of Exhibit K, because I can't make anything of Exhibit K without some explanation of it. I'm putting my colleagues through their paces here, Your Honor, and apologize for that. As you know, it is a sizable record. And while they're digging that up, I will simply direct the court to the, it seems to Council. Oh, sure. Council, may I ask you a question? Are you saying that an allegation of ownership is not sufficient, that they should have said an allegation of beneficial ownership? Correct, Your Honor. How can we be able to assume that when ownership is alleged, this will be beneficial ownership unless there is evidence to the contrary? Well, Your Honor, I think it's, and I'm not saying this, this is what the law says. Merely holding shares in your account that you have already sold because they're due to be settled in T plus 2 is not. That may be, but we're asking what the complaint was. If a complaint alleges that they had more than 10% ownership, then the question of whether this was in effect beneficial or not becomes a question that has to be looked at from the  And then the question is, as Judge Lynch has asked, were the facts sufficiently accepted with respect to this? The allegations in the trading records which were in plaintiff's possession make it clear that those shares were disposed of as recognized by the district court. And shares that are disposed of under the Avalon case, under the SEC v. Drexel case, and other cases cited in our brief, it is beyond dispute that those shares that have been disposed of, that have been sold to a third party, are not beneficially owned even if they still sit in your account because they're awaiting settlement. That is, that's the law, Your Honor. And that is not alleged in the complaint because it can't be alleged in the complaint because the trading records refute that because those shares were disposed of. So use of a loose term like held in the account or owned in the account or something like that is insufficient for purposes of Section 16. Okay, and the basic principle here, Your Honor, and it's a fundamental principle, is that a party can't sell the same shares twice. Once you have disposed of the shares, you no longer have beneficial ownership of those shares. And plaintiff's premise with respect to the calculation of beneficial ownership is premised on the idea that if the shares are sitting in your account, you could still have some ownership over them. And the answer under the law, under Avalon, under Drexel, under the securities laws is you do not have beneficial ownership. And in all events, Your Honors, as was pointed out previously, the blockers in this case, by virtue of their self-affectuating nature, precluded, precluded Hudson Bay from ever owning shares, beneficially owning shares, over 9.99%. Thank you. For these reasons, Your Honor, the lower court decision should be affirmed. Thank you very much. Actually, before you sit down, can you just, again, tell me where in Judge Viscoso's decision the reference to the shares, the disposed of shares, was? Sure, Your Honor. I've got it sitting right here. Page 29, Your Honor. What's the page of the record, of the appendix? Special Appendix 29. Special Appendix 29? Or 29 of her opinion? Yeah, it's Appendix 29. 29 of her opinion is SPA 29 in the boobie. SPA 29, correct, Your Honor. SPA, not J. Right. And the sentence is, significantly, defendants assert, and the complaint concedes, that if the shares defendants had already sold to third parties, are deducted from plaintiff's calculation of defendants' beneficial ownership, defendants would remain under 10% beneficial ownership of outstanding BBBY common stock. And the cite is there to the complaint, paragraphs 186, 193, 201, 202, 209, and 210. And that goes on to cite those, to discuss those paragraphs. Okay. Thank you. Okay. Thank you, Your Honors. Okay. Thank you. Mr. Hunter, you have two minutes for rebuttal. Thank you, Your Honors. I'll address a few of the points my friend made. First of all, I believe my friend overreads, or I should say, the district court overread our complaint. The complaint never conceded that if shares defendants had already sold to third parties, are deducted from plaintiff's calculation of defendants' beneficial ownership, defendants would remain under 10%. That's not what the passage of the court's cite says. We do say that the defendants were accounting for their share ownership incorrectly, but we never said that that was the only thing that was wrong with their calculation. Again, the 10.1% of the shares were in their account, and they had the power to dispose of them. And in addition to that, as I said earlier, the defendants also had the power to direct the disposition of the shares issuable upon the conversion or exercise of their derivative securities. They could have changed their notices to acquire shares at any time to redirect where those shares were sent. I recognize that Section 16 is a somewhat mechanical provision and does not depend on any allegation of fault. But here, it seems to me that what you're saying is that the proof that the blockers were ineffective is that even though Hudson was engaging in these sorts of transactions quite extensively over a period of months, if at one minute the blockers didn't keep their account from having 10.1%, and yet every day they managed to get it down to under 10%, and there's no other point in the entire period that it went over 10%, then the blockers were ineffective, and you are entitled to all of their profits from all of the transactions that took place over a period of several months. That seems weird. Respectfully, Your Honor, that's not correct. That's not our allegation. Our allegation, I would say, first and foremost, is the side letter, the secret side agreement that applied only to Hudson Bay, the one investor out of 29 whose stake was large enough to actually trigger the blockers, and that gave Hudson Bay these secret, special, undisclosed rights to acquire Bed Bath Stock that no other investor had. My friend characterized this as an agreement that required- Well, maybe they did, but it doesn't say that, it doesn't do anything to take back the idea that if it ever goes over 9.9%, any other acquisition is null and void, and the only time it evidently failed, that anyone can point to, is this momentary, very slight exceeding of 10%. Isn't that really what we're talking about? The side letter doesn't... The issue is, does the record of what actually happened show that the side letter meant that there was no possible way of ever enforcing this and the whole thing was a sham? It doesn't say that. The fact that you had to give them the shares, which they were intending to sell, as demonstrated by what they actually did, rather than to hold and accumulate, doesn't mean that the blockers did not effectually keep them from either having the power to vote and control or the power to dispose, because the steady record of their practice shows that they were attempting to dispose of these things before ever going over the threshold. Respectfully disagree, Your Honor. That inverts the Rule 12b6 standard. The court needs to assess whether the blockers were binding and effective on the assumption the well-pleaded facts are true, not assess whether the well-pleaded facts are true on the assumption that the blockers are binding and effective. We've alleged that on February 7th, February 8th, February 9th, Hudson Bay had the right to acquire, within two business days, more than 10% of the stock. And we understand they say, well, some of that stock we've already agreed to sell. But the point is that at any time, Hudson Bay could just redirect where Bed Bath sent that stock by revising and resubmitting a conversion request. So that's one point. I'd like to address, my friends, if I have time, my friends' comments about the CSX opinion. Number one, the SEC views submitted in that case were from a deputy general counsel. They were not full staff views, and they were not entitled to any deference. And I think it's important to point out, this is not in the briefing, but I will point out that the SEC adopted new rules on swaps in 2023 that had the opportunity to address that deputy general counsel's point and adopt the so-called false appearance standard. And the SEC did not adopt that standard. In its release on swaps, it basically recited the rule and said, the rule means what it says. If you use a derivative security to prevent the vesting of beneficial ownership as part of a plan or scheme to evade the disclosure requirements of Section 13D, then you're the beneficial owner of the security. All we're asking is that the plaintiff- Do you think it would be of any use for us to ask the SEC for its views on the plan or scheme issue? We think there's enough here in the record to vacate the district court's judgment, but obviously, we defer to the court on that. Thank you. All right. Well, thank you both. We will reserve decision.